**Below is a Memorandum Decision of the Court.**



_____
**Karen A. Overstreet**
**U.S. Bankruptcy Court Judge**
**(Dated as of Entered on Docket date above)**

_____

Karen A. Overstreet
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Suite 6301
Seattle, WA 98101
206-370-5330

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In re<br><br>Peter James Meyer and<br>Sharee Lynn Meyer,<br><br>     Debtor(s). | Case No.  10-23914 |
| Peter James Meyer and<br>Sharee Lynn Meyer,<br>     Plaintiffs,<br>v.<br><br>U.S. BANK N.A, as Trustee for Structured<br>Asset Securities Corporation Mortgage<br>Pass-Through Certificates, 2006-GEL2, a<br>National Bank; AMERICA'S SERVICING<br>COMPANY, a division of Wells Fargo<br>Bank N.A. dba Wells Fargo Home<br>Mortgage, a National Bank; WELLS<br>FARGO BANK NA, a National Bank;<br>MORTGAGE ELECTRONIC<br>REGISTRATION SYSTEMS, INC., a | Adv. No.  12-01630<br><br><br>**MEMORANDUM DECISION** |

Memorandum Decision - 1

Delaware Corporation; and NORTHWEST
TRUSTEE SERVICES, INC., a
Washington Corporation,

     Defendants.

The trial of this matter commenced on October 8, 2013 and concluded on November 5, 2013. The Court has considered the evidence presented at trial, the records and files in the case, and the parties' post trial submissions. This Memorandum Decision contains the Court's findings of fact and conclusions of law for purposes of Bankruptcy Rule 7052.[1]

## I.  BACKGROUND

Plaintiffs, Peter and Sharee Meyer, commenced this action against Northwest Trustee Services Inc. ("NWTS") and other defendants, asserting various causes of action against the defendants related to foreclosure proceedings against their home located at 12412 – 84th St. S.E., Snohomish, WA (the "Residence"). After summary judgment proceedings, the Meyers' claims remaining for trial included violation of the Washington State Deeds of Trust Act, RCW 61.24 et seq. (the "DOTA"), the Washington State Consumer Protection Act, RCW 19.86 et seq. (the "WACPA"), and the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p (the "FDCPA"). By the time of trial, all of the defendants had been dismissed from the case except NWTS, so the case proceeded to trial on these claims only against NWTS.

## II.  FACTS

On November 10, 2005, the Meyers executed a promissory note in favor of Finance America LLC. (the "Note"). Ex. P-1. To secure payment of the Note, they executed a Deed of

---

[1] Unless otherwise indicated, all Code, Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§101 et seq. and to the Federal Rules of Bankruptcy Procedure, Rules 1001 et seq.

Trust on the same date (the "Deed of Trust") against their Residence. Ocwen Loan Servicing was identified as the servicer in the Deed of Trust, although the Deed of Trust provides both that the servicer might change and that the Note can be transferred. *See* Ex. P-2. The Deed of Trust named DCBL, Inc. as trustee, Finance America LLC as lender, and Mortgage Electronic Registration Systems ("MERS") as nominee of the lender and beneficiary under the Deed of Trust. The Deed of Trust was recorded on November 18, 2005. *Id.* The Meyers moved into the Residence with their three children and began making their payments under the Note in January of 2006.

## A.     The Transfer of the Loan.

Unbeknownst to the Meyers, after the closing of their loan transaction, the Note was transferred into a so-called securitized trust. When and to whom the Note was transferred was highly contested at the trial. After reviewing all of the evidence and testimony, the Court is persuaded that in or around April of 2006, the Meyers' loan became part of a securitized trust entitled Structured Asset Securities Corporation Mortgage Pass-Through Certificates Series 2006-GEL2 ("GEL2"). At some point prior to April 1, 2006, the Note was indorsed in blank via a separate Allonge, which is undated (the "Allonge"), but which is signed by a Loan Administration Supervisor for Finance America. *See* Ex. D-1. Although the path of the Note into GEL2 is not clear, the Court finds it more probable than not that possession of the Note, after its indorsement in blank, was first obtained by Lehman Brothers Holdings, Inc. ("Lehman") and then deposited by Lehman into GEL2 pursuant to the terms of a Trust Agreement dated April 1, 2006 (the "Trust Agreement"), among Structured Asset Securities Corp, as Depositor, Aurora Loan Services LLC, as Master Servicer, Clayton Fixed Income Services, Inc., as Credit

Risk Manager, and U.S. Bank National Association, as Trustee ("U.S. Bank"). The Deed of Trust has never been assigned by Finance America.

According to the Trust Agreement, Lehman acquired various loans, sold them to Structured Asset Securities Corp., which in turn "deposited" the loans into GEL2. Ex. D-3, pp. 1, 46. Under the Trust Agreement, individual investors could acquire differing types of interests in GEL2 by purchasing the certificates described in the Trust Agreement.

John Richards, a vice president of U.S. Bank, testified concerning the Trust Agreement. According to his testimony, GEL2, as a trust, is not an operating entity. It has no employees, no office, and acts solely through its trustee, U.S. Bank. According to Mr. Richards, U.S. Bank's duties as trustee were primarily to address the needs of the investor certificate holders, with the Trust Agreement placing responsibility for the management of the loans with one or more servicers. Under the Trust Agreement, U.S. Bank also stands as the title holder of the loans, by its possession of the loan notes or possession through one or more custodians.

By separate agreement, Wells Fargo Bank, N.A. ("Wells Fargo") acted as an independent contractor and servicer of the loans which were part of GEL2 for the "seller," defined under the agreement as "Lehman Brothers Holdings Inc. or its successor in interest or assigns." Ex. D-4, Securitization Subservicing Agreement, dated April 1, 2006 (the "Servicing Agreement"), Art. 1, Art. III §§ 3.01. U.S. Bank is not a party to that agreement, and only acknowledged it as the trustee. *Id*. Mr. Richards testified that Wells Fargo also acted as a custodian for GEL2. Under the Servicing Agreement, Wells Fargo was to maintain possession of loan files on behalf of U.S. Bank, as trustee for GEL2. Ex. D-4, p. 13. Under the Trust Agreement, U.S. Bank was authorized to execute powers of attorney in favor of any servicer to permit the servicer to

Memorandum Decision - 4

foreclose against any mortgaged property in GEL2 [Ex. D-3, p. 123], but all actions in pursuit of foreclosure were delegated to the servicer under the Servicing Agreement. Brock Wiggins, a vice president for loan documentation for Wells Fargo, identified three separate Limited Power of Attorney documents, each executed by U.S. Bank and recorded in Snohomish County in 2007, pursuant to which he testified Wells Fargo acted as attorney-in-fact for U.S. Bank under the Servicing Agreement. Ex. D-6, D-7, D-8.

The Meyers sought to show at trial that their loan was not part of GEL2 and that neither GEL2 nor U.S. Bank had possession of the Note. NWTS submitted a redacted schedule of loans, which included the Meyers' loan, and which Brock Wiggins testified was the schedule of loans which were part of GEL2 and being serviced by Wells Fargo under the Servicing Agreement. Ex. D-5. The Court ordered an *in camera* submission of an unredacted version of the schedule of loans, and the Court verified that the Meyers' loan was referenced on line 858 of the schedule of loans. *See* Declaration of Brock Wiggins, Dkt. 136. A column in that spreadsheet states that information concerning the Meyer loan was shown as of April 1, 2006, indicating that the loan had become part of GEL2 on or before that date. Mr. Wiggins testified that according to Wells Fargo's records, Wells Fargo took possession of the Note and the Allonge on March 1, 2006, and that those documents and the other documents related to the Meyer loan had been maintained initially in Wells Fargo's document vault in San Bernadino, but subsequently moved to Wells Fargo's vault in Minnesota. Ex. P-13. The original Note, which Mr. Wiggins testified had been in Wells Fargo's continuous possession pursuant to the terms of the Servicing Agreement, was produced at trial for the Court's examination. Based upon the evidence, the Court concludes that the holder of the Note is Wells Fargo, as custodian for U.S. Bank, as trustee for GEL2.

**B.      Foreclosure.**

The Meyers continued to make their payments under the Note until they started to experience financial problems toward the end of 2008.   It is not clear from the evidence when the Meyers initially defaulted in their payments under the Note.  There is no evidence that any lender ever issued a formal notice of default.[1]  On March 9, 2009, NWTS received its first referral to foreclose the Deed of Trust, which referral was in the form of a Case Information Report (the "2009 CIR") that NWTS pulled from a third party website called Vendorscape.  Ex. D-9.

Jeff Stenman, the Foreclosure Manager and Director of Operations for NWTS, testified that NWTS has used Vendorscape to access foreclosure assignments for 10 years.  NWTS has no procedures to verify the accuracy of the information contained in Vendorscape, even though Mr. Stenman admitted that he does not know how the information is generated within Vendorscape or who prepares it.  He described Vendorscape as a secure website which NWTS can access using a password.  If a NWTS employee has any question about the foreclosure process or any documentation, they may leave a message in Vendorscape and await a response.  Mr. Stenman affirmed that NWTS employees do not contact servicers or lenders in any other way, and are instead trained to rely on the information provided through Vendorscape.

Consistent with NWTS's customary practice, it used the information from Vendorscape and the 2009 CIR, without any verification, to initiate the foreclosure against the Meyers' Residence.  The 2009 CIR is a table collection of data and does not contain any instructions.  The 2009 CIR lists the Meyers as the obligors under the Note, it includes the Residence address and

---

[1]  Mr. Richards testified that it was the servicer's responsibility under the Servicing Agreement to declare a default under a loan which was part of GEL2, and not the duty of U.S. Bank as trustee.

the Meyers' social security numbers, and it shows U.S. Bank as the trustee for GEL2 as the "beneficiary." The report mistakenly lists the interest rate on the Note as not being adjustable, when it fact it was adjustable. The interest rate is listed as 9.6050% with the last payment made on September 1, 2008. Mr. Stenman testified that he assumed the information in this report came from America's Servicing Company ("ASC"), which is listed in the report as the servicer, and he testified that he thought (but did not say for sure) that ASC was a division of Wells Fargo.

Based upon the information in the 2009 CIR, Mr. Stenman executed an Assignment of Deed of Trust from MERS to "U.S. Bank National Association as Trustee for Structured Asset Securities Corporation Mortgage Pass-Through Certificates 2006 GEL2, as beneficiary" on March 10, 2009, the day after receiving the referral. Ex. P-3. Although Mr. Stenman was an employee of NWTS, he prepared and signed the assignment as a Vice President of MERS pursuant to what he described as a tri-party agreement between himself, Wells Fargo and MERS. Although NWTS repeatedly relied at trial on the authority of this so-called tri-party agreement, the agreement was never produced in evidence. The Assignment of Deed of Trust was recorded on July 1, 2009.

On March 26, 2009, Anne Neely signed an appointment of successor trustee, appointing NWTS as successor trustee. *See* Ex. P-4. Ms. Neely is identified in the document as a vice president of loan "doc" Wells Fargo, acting as attorney-in-fact for U.S. Bank, trustee for Structured Asset Securities Corporation Mortgage Pass-Through Certificates 2006 GEL2. The

Memorandum Decision - 7

appointment of successor trustee was recorded July 1, 2009. It incorrectly refers to MERS as the beneficiary.[2]

For reasons that were not disclosed during the trial, the 2009 foreclosure proceeding against the Meyers was discontinued and a new proceeding started in 2010.  The 2010 foreclosure was based upon a case information report which NWTS accessed in Vendorscape on June 23, 2010 (the "2010 CIR").  Ex. P-15.  With the report was a separate set of instructions with an express request to commence foreclosure, but it is not clear from whom those instructions originated. Ex. P-16.  The 2010 CIR carried over the incorrect reference to the Note as not adjustable, it showed a lower principal balance than the 2009 CIR, and a higher interest rate of 9.6250%.  It also showed the last payment made on February 1, 2009.

Heather Smith of NWTS prepared the Notice of Default dated July 9, 2010 (the "Notice of Default") based on the information contained in the 2010 CIR.  Ex. P-5.  At the time, Ms. Smith was a foreclosure assistant with NWTS.  Paragraph (K) of the Notice of Default provides:

> K)  Contact Information for Beneficiary (Note Owner) and Loan Servicer
>
> The beneficiary of the deed of trust is US Bank National Association, as Trustee for Structured Asset Securities Corporation Mortgage Pass-Through Certificates, 2006-GEL2, whose address and telephone number are:
>
> c/o America's Servicing Company
> MAC X7801-02T, 3476 Stateview Blvd
> Fort Mill, SC 29715
> 855-248-5719

---

[2]   On March 10, 2009, Mr. Stenman had assigned MERS' interest in the Deed of Trust to U.S. Bank.

Memorandum Decision - 8

The loan servicer for this loan is America's Servicing Company, whose address and telephone number are:

MAC X7801-02T
3476 Stateview Blvd
Fort Mill, SC 29715
800-662-5014

In paragraph L of the notice, under "Notice pursuant to the Federal Fair Debt Collection Practices Act" it states "[t]he creditor to whom the debt is owed [sic] US Bank National Association, as Trustee for Structured Asset Securities Corporation Mortgage Pass-Through Certificates 2006-GEL2/America's Servicing Company."  The Notice of Default incorrectly referred to NWTS as the "authorized agent" for U.S. Bank.  As of the date of the notice, there is no evidence that NWTS was an authorized agent for any of Wells Fargo, U.S. Bank, or GEL2; instead, by that time NWTS was already the trustee under the Deed of Trust with statutory duties to the Meyers. The Notice of Default also states "[t]he beneficiary declares you in default for failing to make payments as required by your note and deed of trust." *Id.*, ¶ C.  However, there is no evidence that GEL2, U.S. Bank, or Wells Fargo/ASC ever formally declared the Meyers in default and no evidence that NWTS was the beneficiary or was authorized to declare such a default.

In connection with the preparation of the Notice of Default, NWTS received a Foreclosure Loss Mitigation Form declaration (the "Loss Mitigation Form") and a Beneficiary Declaration (the "Beneficiary Declaration") as required by RCW 61.24, each dated June 24, 2010.  The Loss Mitigation Form was signed under penalty of perjury by John Kennerty, "VP of Loan Documentation" for ASC.  *See* Ex- P-5.  The declaration states that "[t]he Beneficiary or Beneficiary's authorized agent has contacted the borrower under, and has complied with, Section 2 of Chapter 292, Laws of 2009 (contact provision to 'assess the borrower's financial ability to

pay the debt secured by the deed of trust, and explore options for the borrower to avoid foreclosure')."  There is no evidence that any employee or representative of ASC, U.S. Bank, or GEL2 contacted the Meyers before the foreclosure was commenced.  Mr. Kennerty also signed the Beneficiary Declaration, signing that document as a "VP Loan Documentation" for Wells Fargo as attorney-in-fact for US Bank.  *See also*, Exhibit D6, 7 and 8, Limited Power of Attorney.  The Beneficiary Declaration, which is also under penalty of perjury, states that U.S. Bank, as trustee for GEL2, was the holder of the Note.  Ex. P-5.  Mr. Kennerty testified at a deposition that he routinely signed documents of this type despite the fact that he had no personal knowledge of any of the factual statements therein, but that he merely received these forms from other departments at Wells Fargo and signed them.  Ex. P-17, pp. 59-67.[3]

No one at NWTS took any action to verify any of the information used in the Notice of Default or referenced in the Loss Mitigation Form or Beneficiary Declaration.  The information in the Notice of Default was merely pulled mechanically from the 2010 CIR.  Ms. Smith testified that she had been trained not to make any inquiries concerning these documents, but instead to rely on them.  In fact, when asked repeatedly by counsel for the Meyers whether she had verified information she received, her consistent response was "I have been trained to rely on the referral information in Vendorscape" or "I have been trained to rely on the Beneficiary Declaration."  As to Mr. Kennerty's authority, Ms. Smith testified that she knew he worked for Wells Fargo and/or ASC.  She further testified that in her experience, Wells Fargo routinely executed documents for U.S. Bank.

---

[3]  Mr. Kennerty's deposition was taken in the case of *Geline v. NWTS* on May 20, 2010, so it would be directly relevant to the procedures used by him at or around the time the Meyers' home foreclosure was commenced.  Over the objection of NWTS, the Court admitted Mr. Kennerty's deposition pursuant to Rules 804(a)(5)(A) and 804(b)(1), and gave NWTS the opportunity to object to particular parts of the deposition.  NWTS raised no objections to any part of the deposition.

Memorandum Decision - 10

The Meyers found the Notice of Default taped to the door of their Residence. They were not familiar with any of the entities identified in the notice except for ASC, to which they had been making mortgage payments. The notice stated that in order to avoid foreclosure, the Meyers would have to pay $82,035.65. When Mr. Meyer called the phone number for ASC listed in the notice, the individual who answered the phone identified themselves as an employee of Wells Fargo. No one explained to him what the relationship was between these two entities. When he contacted NWTS, he was referred to "a local law firm."

Mr. Meyer did not agree with the information contained in the notice. He believed that the arrears listed were incorrect because he believed the interest rate listed in the Notice of Default of 9.6% was incorrect. He contended that their monthly payment was only $3200, whereas the payment shown in the Notice of default was $4,066.50. The Meyers did not believe they owed any money to U.S. Bank or GEL2. Mr. Meyer attempted to contact Wells Fargo, ASC and NWTS with his concerns, but was unable to resolve the issues. Mr. Meyer also attempted to locate Finance America, the original lender.

On August 13, 2010, NWTS executed a notice of trustee's sale (the "Notice of Trustee's Sale"). Ex. P-6. The notice recited that the Residence would be sold on the steps of the Snohomish County Courthouse on November 19, 2010, unless the Meyers paid $82,431.77 by November 8, 2010. Ms. Smith signed the Notice of Trustee's Sale for NWTS.

## C. The Bankruptcy Proceedings.

Failing to resolve the situation on their own, the Meyers hired attorney Richard Jones to represent them in July of 2010. *See* Standard Retainer Agreement attached to the Declaration of

Memorandum Decision - 11

Richard L. Jones, Case No. 10-23914, Dkt. 51.[4]  The Meyers also retained attorney Larry

Feinstein to assist them with the filing of a chapter 13 bankruptcy proceeding on November 18,

2010, the day before the scheduled trustee's sale of their Residence.   Mr. Meyer testified that but

for the foreclosure, he would not have filed bankruptcy and that the sole reason for the filing was

to find a way to save their home from foreclosure.

Through Mr. Jones, by letter dated December 17, 2010, the Meyers issued a Qualified

Written Request under the Truth in Lending Act, directed at ASC, in order to determine the

holder and owner of the Note.  Ex. P-7.  ASC sent a response to Mr. Feinstein on January 12,

2011.  Ex. P-14.  The letter advised that the Meyers' loan was in a "pool of loans" managed by

U.S. Bank, but it provided no detailed information about how or when that had occurred, or even

the name of the fund.  The letter did, however, contain a contact address for U.S. Bank.

On December 21, 2010, U.S. Bank, as trustee for GEL2, filed a proof of claim in the

Meyers' bankruptcy proceeding listing a total amount due under the Deed of Trust as

$502,190.76.  In the proof of claim, unpaid interest is calculated at the rate of 9.625% (the rate

shown in the 2010 CIR) from January 1, 2009.  The claim shows a payment amount of $4,066.50

per month for the period February 1, 2009, to June 2009, but then reduced payments of

$3,448.30 per month as of December 1, 2010. The Meyers' first proposed chapter 13 plan

provided only for payments of $2,000 per month on their mortgage; their plan stated that they

were working on a loan modification with the lender.  Case No. 10-23914, Dkt. 6.  U.S. Bank

opposed confirmation of the plan on the grounds that it did not provide for payment of the

current mortgage payment of $3,448.30 per month or provide for the cure of the prepetition

arrears totaling $86,020.02.  *Id.*, Dkt. 19.

---

[4]  The Court may take judicial notice of its pleadings and files.  Fed.R.Evid. 201.

The Meyers and U.S. Bank were unable to resolve their disputes over plan confirmation. On June 1, 2011, the Meyers stipulated that U.S. Bank could have relief from the automatic stay effective June 22, 2011. Case No. 10-23914, Dkt. 30. They removed their home mortgage from their plan and their plan was confirmed on August 19, 2011. *Id.*, Dkt. 40.

On June 29, 2011, NWTS restarted the foreclosure process with the issuance of an Amended Notice of Trustee's Sale with a sale date of August 12, 2011. Ex. P-8. Despite having agreed in the bankruptcy case to relief from stay, the Meyers then commenced this adversary proceeding on July 23, 2012, and sought a temporary restraining order enjoining the scheduled foreclosure sale. U.S. Bank did not appear at the hearing on August 1, 2012, nor did it file any opposition to the entry of the temporary restraining order. Heidi Buck appeared for NWTS at the hearing as NWTS was also a named defendant in the action. On August 2, 2012, a temporary restraining order was entered, which required the Meyers to deposit $3,616.03 into the Registry of the Court by August 6, 2012, pursuant to RCW 61.24.130. A hearing on the entry of a preliminary injunction was scheduled for August 10, 2012. U.S. Bank and ASC, through the same counsel, filed a joint non-opposition to the request for a preliminary injunction, provided the Meyers would continue to make monthly payments of $3,616.03 pursuant to the terms of the temporary restraining order. Dkt. 19. The non-opposition recited that the parties had engaged in three failed mediation attempts. This Court entered the preliminary injunction on August 20, 2012, requiring the Meyers to continue to make monthly payments into the Registry of the Court. Dkt. 22.

Multiple motions were filed in this case, including various discovery motions. On March 29, 2013, U.S. Bank and MERS filed a motion to compel the Meyers' responses to interrogatories and request for production of documents. The Meyers responded and at a hearing

Memorandum Decision - 13

on April 19, 2013, the Court gave the Meyers until April 30, 2013 to fully respond to the discovery requests. In addition, the Court awarded discovery sanctions of $1,200 to U.S. Bank and MERS. *See* Order at Dkt. 76. U.S. Bank and Wells Fargo then moved on May 17, 2013 to dissolve the preliminary injunction entered by the Court on the ground that the Meyers had failed to make the monthly payments into the court registry since September 10, 2012. These defendants also filed their second motion to compel discovery responses from the Meyers, complaining that the Meyers had failed to comply with the Court's prior order to compel. The Meyers did not respond to either motion, and on June 5, 2013, the Court entered orders granting the defendants' motion to dissolve the preliminary injunction (Dkt. 90), and dismissing all claims against U.S. Bank and MERS as a discovery sanction (Dkt. 91). The motion to dissolve the injunction also sought an order allowing the trustee's sale to be reset. On June 13, 2013, the Court entered an order providing that the trustee's sale could be reset pursuant to applicable non-bankruptcy law. As of the date of trial, however, the Meyers' Residence had not been sold at trustee's sale.

The Meyers contend that NWTS violated its duties as a foreclosure trustee under Washington state law. They contend that they have been damaged as a consequence of NWTS's unlawful acts by having to (1) hire Mr. Jones to issue a Qualified Written Request to determine the name and contact information for the holder and owner of their loan, (2) file a bankruptcy proceeding in order to stop what they believed was an unlawful foreclosure action against their Residence, (3) incur attorney's fees in connection with the foreclosure and the bankruptcy, and (4) incur expenses moving to a rental house to avoid the uncertainty associated with the multiple notices of trustee's sale.

Memorandum Decision - 14

Between the time the Meyers hired Mr. Jones and the time ASC responded to their Qualified Written request, Mr. Jones incurred fees of $980.  Case No. 10-23914, Dkt. 54, p. 3. Mr. Feinstein charged the Meyers $3,500 for the filing and preparation of their bankruptcy case, and the Meyers paid the bankruptcy filing fee of $274.

Mr. and Mrs. Meyer also testified to the emotional effects of the foreclosure proceedings on them.  Mr. Meyer described it as "four years of hardship." Although he took full responsibility for his financial problems and default in payments under the Note, he testified that the stress of foreclosure and the attempts to get back on track with his mortgage resulted in severe stress affecting his work, his marriage, and his parenting, for which he ultimately sought professional help.  Given the stress, he and his wife made the decision to move into a rental house in July of 2013.  Their monthly rent under the lease is $2,595, which they had paid from July through October as of the time of trial ($10,380).[5]  The Meyers were also required to pay a security deposit of $2,245 and a pet deposit of $300.  In addition, Mr. Meyer testified to moving expenses incurred of $2,625, which included the time that he and his wife were off work in order to handle the move themselves.  Mr. Meyer also calculated his and his wife's time off from work in order to attend multiple mediations and hearings, which he estimated cost him $3,200 in total, including travel expenses.  Their damages, according to the evidence, amount to $23,504.  Mr. Meyer testified that he has also incurred attorney's fees and costs in this litigation.

### III.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(B),(K).

---

[5]  The Meyers were required to pay $3,616.03 into the registry of the court pursuant to the Court's preliminary injunction, thus the move reduced their monthly housing expense by just over $1,000.

Memorandum Decision – 15

## IV. DISCUSSION

### A. Violation of the Washington Deeds of Trust Act.

Washington permits the foreclosure of deeds of trust nonjudicially under the DOTA. The statute offers a convenient and relatively inexpensive method for foreclosing deeds of trust, provided the lender complies with the terms of the statute.

> Washington's deed of trust act should be construed to further three basic objectives. *See* Comment, *Court Actions Contesting the Nonjudicial Foreclosure of Deeds of Trust in Washington*, 59 Wash.L.Rev. 323, 330 (1984). First, the nonjudicial foreclosure process should remain efficient and inexpensive. *Peoples Nat'l Bank v. Ostrander*, 6 Wash.App. 28, 491 P.2d 1058 (1971). Second, the process should provide an adequate opportunity for interested parties to prevent wrongful foreclosure. Third, the process should promote the stability of land titles.

*Cox v. Helenius*, 103 Wash.2d 383, 387, 693 P.2d 683 (1985).

### 1. The Changing Legal Landscape of the DOTA.

The Meyers contend that NWTS violated the DOTA by commencing a foreclosure against their Residence without the proper authority under Washington State law and that NWTS failed to comply with its duties to them as trustee under RCW 61.24.010(3).

As is typical in a number of similar cases asserting claims under the DOTA, NWTS argues that because the Residence has not been sold, the Meyers cannot, as a matter of law, establish damages. As is also typical in these cases, NWTS argues that in Washington, there is no cause of action for wrongful initiation of foreclosure. Federal judges in the Western District of Washington addressing these issues have generally followed the case of *Vawter v. Quality Loan Service Corp.*, 707 F.Supp.2d 1115, 1123 (W.D. Wash. 2010). In that case, addressing a motion to dismiss by the lender and MERS, the court held that under Washington state law "the DTA does not authorize a cause of action for damages for the wrongful initiation of nonjudicial

Memorandum Decision - 16

foreclosure proceedings where no trustee's sale occurs." However, recent state court cases have undermined the validity of this statement of the law. In *Walker v. Quality Loan Service Corp.*, 176 Wash.App. 294, 308 P.3d 716 (Wash.Ct.App. 2013), the Washington State Court of Appeals stated its disagreement with the holding in *Vawter*, concluding that *Vawter* relied on cases which were decided before the legislature enacted the current version of RCW 61.24.127 and before the Washington Supreme Court decided *Bain v. Metropolitan Mortgage Group, Inc.*, 175 Wash. 2d 83, 10, 285 P.3d 34 (2012). The court in *Walker* held:

> Because the legislature recognized a presale cause of action for damages in RCW 61.24.127(1)(c), we hold that a borrower has an actionable claim against a trustee who, by acting without lawful authority or in material violation of the DTA, injures the borrower, even if no foreclosure sale occurred. Additionally, where a beneficiary, lawful or otherwise, so controls the trustee so as to make the trustee a mere agent of the beneficiary, then, as principal, it may have vicarious liability."

176 Wash.App. at 313. *See also Bavand v. OneWest Bank, F.S.B.,* 176 Wash.App. 475, 309 P.3d 636 (Wash.Ct.App. 2013)(rejecting *Vawter*).

NWTS urges the Court to decline to follow *Walker*, arguing that as an intermediate appellate decision, it is not binding on this Court, and further, that the question addressed by *Walker* was certified to the Washington Supreme Court for review by District Judge Marsha Pechman in *Frias v. Asset Foreclosures Services, Inc.*, Case no. C13-760-MJP, by order entered September 25, 2013. In addition, NWTS offers the additional authority from the Ninth Circuit Bankruptcy Appellate Panel, *Brown v. Bank of America, et al.,* BAP No. WW-12-1534, in which the panel followed *Vawter*, without any citation to *Walker* or *Bavand.*

As far as this Court is concerned, the Washington courts have spoken: *Walker* and *Bavand* reject the holding in *Vawter* that there is no cause of action for violation of the DOTA. Bankruptcy courts routinely follow state courts when addressing legal issues under state law,

Memorandum Decision - 17

particularly with respect to questions involving real property.  *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914 (1979).  In following state court cases, this Court has never distinguished between state appellate and supreme court cases.  Moreover, the Court finds the *Walker* case particularly thoughtful and on point.  Following *Walker*, the Court must determine whether the Meyers proved that NWTS violated some provision of the DOTA.

### 2.    NWTS's Duties Under the DOTA.

In 2008, the legislature amended the DOTA to provide that a trustee has no fiduciary duty to either the lender or the homeowner in a foreclosure action.   Specifically, subsections (3) and (4) were added to RCW 61.24.010, and they provide:

> (3) The trustee or successor trustee shall have *no fiduciary duty* or fiduciary obligation to the grantor or other persons having an interest in the property subject to the deed of trust.
> (4) The trustee or successor trustee shall *act impartially* between the borrower, grantor, and beneficiary.

Laws of 2008, ch. 153, § 1, codified in part as RCW 61.24.010(3) and (4)(emphasis added).  In 2009, the statute was revised again, and RCW 61.24.010(4) was rewritten to read:  "(4) The trustee or successor trustee has a duty of *good faith* to the borrower, beneficiary, and grantor." Laws of 2009, ch. 292, § 7, codified in part as RCW 61.24.010(4)(emphasis added).

In *Klem v. Washington Mutual Bank*, 176 Wash.2d 771, 295 P.3d 1179 (2013), the Washington Supreme Court reviewed the history of the DOTA and issued a strong statement with particular reference to the duty of a trustee under that statute.  Squarely at issue in the case was the trustee's failure to exercise independent discretion to postpone a trustee's sale. Recognizing the "tremendous power" given a trustee to sell a borrower's family home, and the need to construe the DOTA in favor of borrowers "because of the relative ease with which lenders can forfeit borrowers' interests," the court concluded that "[i]n a nonjudicial foreclosure,

Memorandum Decision - 18

the trustee undertakes the role of the judge as an impartial third party who owes a duty to both parties to ensure that the rights of both the beneficiary and the debtor are protected." *Id.* at 789-790. "If the trustee acts only at the direction of the beneficiary, then the trustee is a mere agent of the beneficiary and a deed of trust no longer embodies a three party transaction." *Id.* The *Klem* court rejected the trustee's argument that "no competent Trustee would fail to respect its Beneficiary's instructions not to postpone a sale without first seeking the Beneficiary's permission" and held that in failing to exercise its independent judgment as to whether the sale should be postponed, the trustee violated its duty to the borrowers. *Id.* at 791.[6]

Nonjudicial foreclosure in Washington is initiated by the issuance of a notice of default to the borrower. Under RCW 61.24.030, the notice of default must be transmitted "by the beneficiary or trustee" 30 days before the notice of sale is recorded, transmitted or served. The "beneficiary" under the DOTA is the "holder of the instrument or document evidencing the obligations secured by the deed of trust, excluding persons holding the same as security for a different obligation." RCW 61.24.005(2).

In this case, NWTS referred to itself in the Notice of Default as the authorized agent for the beneficiary even though the evidence established that it was not an authorized agent for U.S. Bank. Furthermore, at the time the Notice of Default was issued, NWTS was already the successor trustee under the DOTA with duties to both the Meyers and U.S. Bank. Ms. Smith testified that the misreference to its role as agent was just a mistake. The appearance to the Meyers, however, was that a lender they had never heard of, through an agent they had never heard of, was declaring them in default under their Note and attempting to take away their home.

At the time the Notice of Default was issued, NWTS was required to include additional

---

[6] The court went on to hold that the trustee's failure to exercise independent judgment in continuing the trustee's sale was an unfair or deceptive act or practice under the WACPA.

Memorandum Decision - 19

and specific information in the notice pursuant to RCW 61.24.030(8), which was added to the DOTA effective July 26, 2009. Laws of 2009, Ch. 292, § 2. Of relevance here is the requirement in subsection (l) that NWTS include in the Notice of Default "the name and address of the owner of any promissory notes or other obligations secured by the deed of trust and the name, address, and telephone number of a party acting as a servicer of the obligations secured by the deed of trust." According to the statute, inclusion of this information is mandatory "in the event the property secured by the deed of trust is residential real property."

At trial, NWTS successfully proved, by resort to many complicated and lengthy exhibits, that as of the commencement of the foreclosure, U.S. Bank, as trustee for GEL2, was the holder of the Note and that GEL2 was the owner of the Note.[7] Despite the simple direction of the statute, however, NWTS failed to include an address and phone number for either U.S. Bank or GEL2. Instead, NWTS merely listed the address for the servicer, ASC, for both the beneficiary and the servicer, with two different phone numbers for ASC. Accurate information identifying the beneficiary and owner of the obligation is important to homeowners like the Meyers, who learn for the first time in a notice of default that their mortgage obligation is owned by someone with whom they never did any business or to whom they have never made any payment, because they have no idea if it is real or a potential scam. In this case, the failure of NWTS to include accurate information in the Notice of Default eventually caused the Meyers to hire an attorney and file bankruptcy in order to verify the true owner of their home loan.

---

[7] RCW 61.24.030 refers in different places to the "beneficiary of the deed of trust," the "beneficiary" and the "owner" of the note or obligation secured by the deed of trust. The Court must assume those references are intentional. RCW 61.24.005(2) defines "beneficiary" as the "holder of the instrument or document evidencing the obligations secured by the deed of trust…." Under Article 3 of Washington's version of the Uniform Commercial Code, the "owner" and "beneficiary" of a note can be different persons. A person entitled to enforce an instrument means (i) the holder of the instrument or (ii) a nonholder in possession of the instrument who has the rights of the holder. RCW 62A.3-301. A person may be entitled to enforce a negotiable instrument even though the person is not the owner of the instrument. RCW 62A.3-301. Mr. Wiggins testified that although U.S. Bank was the holder of the Note, GEL2 was the owner of the Note.

Memorandum Decision - 20

Also by amendment in 2009, the Washington legislature added a new requirement

enacted as subsection (7)(a) to RCW 61.24.030 as follows:

> (7)(a) That, for residential real property, before the notice of
> trustee's sale is recorded, transmitted, or served, the trustee shall
> have proof that the beneficiary is the owner of any promissory note
> or other obligation secured by the deed of trust. A declaration by the
> beneficiary made under the penalty of perjury stating that the
> beneficiary is the actual holder of the promissory note or other
> obligation secured by the deed of trust shall be sufficient proof as
> required under this subsection.
>
> (b) Unless the trustee has violated his or her duty under RCW
> 61.24.010(4), the trustee is entitled to rely on the beneficiary's
> declaration as evidence of proof required under this subsection.

In this case, NWTS had a declaration from Wells Fargo, the purported attorney-in-fact for U.S.

Bank. Although NWTS submitted into evidence three separate powers of attorney issued by

U.S. Bank to Wells Fargo in 2007 which, if still in effect in 2010 when the Meyers' foreclosure

was commenced, would have given Wells Fargo broad powers to sign documents related to

foreclosures on behalf of U.S. Bank, NWTS had no notice or knowledge of any of these powers

of attorney or any other agreement substantiating the authority of Wells Fargo to act on behalf of

U.S. Bank. Further, Ms. Smith, as the foreclosing NWTS officer, was specifically trained not to

seek out that information. Instead, NWTS merely accepted without question the purported

authority of these entities.[8]

The Meyers argue that a trustee may not rely on a beneficiary declaration executed by

anyone other than the beneficiary. Further, they argue that the trustee must have proof, in the

words of the statute, that the beneficiary is the "owner" of the note as opposed to the holder of

---

[8] The 2010 CIR listed ASC as the servicer of the Meyers' loan. Nowhere in that report, however, does it refer to
Wells Fargo as attorney in fact for U.S. Bank. Because the powers of attorney were recorded in Snohomish County,
presumably NWTS could have located them in a title search. Ms. Smith, however, testified that she did not see the
powers of attorney prior to issuing the Notice of Default. Instead, she relied on the Beneficiary Declaration and on
her knowledge that Mr. Kennerty worked for ASC/Wells Fargo.

Memorandum Decision - 21

the note.  It is not necessary to address either of these arguments, however, because the Court concludes that NWTS could not rely on the Beneficiary Declaration because it had no proof that Wells Fargo had authority to execute that declaration on behalf of U.S. Bank.

In this case, NWTS also failed to comply with the requirements of RCW 61.24.030(9). Under that section, before a notice of trustee's sale may be recorded, in the case of owner-occupied residential real property, the beneficiary must have complied with RCW 61.24.031. RCW 61.24.031(1)(a) provides that a trustee, beneficiary, or its authorized agent may not issue the notice of default until 30 days after satisfying the due diligence requirements described in subsection (5) if the borrower has not responded, or 90 days after contact was initiated if the borrower does respond.  Under RCW 61.24.031(9), the beneficiary or authorized agent must prepare a "Foreclosure Loss Mitigation Form" the contents of which are set out in the statute. The purpose of the foreclosure loss mitigation form is to confirm for the trustee that the due diligence required under the statute has been completed as required.

In this case, NWTS accepted the Loss Mitigation Form from ASC signed by John Kennerty.  The form stated that "[t]he beneficiary, *or their authorized agent* has contacted the borrower under, and has complied with, Section 2 of Chapter 292, Laws of 2009…."  This is in reference to the requirement of RCW 61.24.031(b) that the "beneficiary or its authorized agent" contact the borrower in writing or by telephone to assess their financial ability to pay the debt and to explore options for the borrower to avoid foreclosure.  The statute contains specific requirements for the content of the communication between the beneficiary and the borrower. ASC was not the beneficiary, nor was it an authorized agent of the beneficiary.  Wells Fargo was an independent contractor under the Servicing Agreement, and not an authorized agent of U.S. Bank.  Thus, any communication by ASC to the Meyers (assuming there was some

Memorandum Decision - 22

communication initiated by ASC; there was no evidence of same) would not have satisfied the statute. Moreover, Mr. Kennerty testified in his deposition that he had no personal knowledge of the statements in these declarations, and that he relied completely on his collections and foreclosure departments to provide the information to him. NWTS had no evidence that ASC was the authorized agent of U.S. Bank for the purpose of executing this document.

The Court concludes that NWTS failed to materially comply with its duties under the DOTA. RCW 61.24.127(1)(c). Misrepresenting itself in the Notice of Default as the authorized agent of U.S. Bank, NWTS declared a default under the Note, commenced a foreclosure against the Residence without verifying in any way the authority of Wells Fargo or U.S. Bank to maintain such foreclosure, and failed to provide the Meyers with the most basic information required by statute about the current holder and owner of their loan. The Notice of Default, which did not meet the requirements of the DOTA, tainted the entire foreclosure process.

**B. Violation of the Washington Consumer Protection Act**.

The WACPA, RCW 19.86 et seq., prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. RCW 19.86.020. The Meyers base their WACPA claim on the failure of NWTS to comply with the DOTA. Because NWTS's violation of the DOTA is not a *per se* violation of the WACPA under the facts of this case, the Court must examine whether the Meyers have proved each element required under the WACPA.[1]

Case law in Washington mandates that a plaintiff prove the following elements to recover under the WACPA: (1) an unfair or deceptive act or practice; (2) the act or practice occurred in

---

[1] *See* RCW 61.24.135. "A *per se* unfair trade practice exists when a statute which has been declared by the Legislature to constitute an unfair or deceptive act in trade or commerce has been violated." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 786, 719 P.2d 531 (1986).

trade or commerce; (3) the act or practice impacts the public interest; (4) the act or practice caused injury to the plaintiff in his business or property; and (5) the injury is causally linked to the unfair or deceptive act. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 780, 719 P.2d 531 (1986). To clear up any confusion about these elements, the court in *Klem* held "that a claim under the Washington CPA may be predicated upon a per se violation of statute, an act or practice that has the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute but in violation of public interest." *Klem*, 176 Wash.2d at 787.

The statutory definitions of "trade" and "commerce" require that the act directly or indirectly affect the people of the State of Washington. The act permits any "person who is injured in his or her business or property" to bring a civil suit for injunctive relief, damages, attorneys' fees and costs, and treble damages. RCW 19.86.090.

1.      **Unfair and Deceptive Act.**

After the decision of the Washington Supreme Court in *Klem v. Washington Mutual*, there is no uncertainty as to how to apply the WACPA elements in a case like this one. The court in *Klem* held that the practice of a trustee in a nonjudicial foreclosure deferring to the lender on whether to postpone a foreclosure sale and thereby failing to exercise its independent discretion as an impartial third party with duties to both parties is an unfair or deceptive act or practice and satisfies the first element of the WACPA. Like the record before the court in *Klem*, the record in this case supports the conclusion that NWTS abdicated its duty to act impartially toward both sides. For the following reasons, the Court finds that NWTS's multiple violations of the DOTA, as detailed in the preceding section, also constitute violations of the WACPA.

The standard practices of NWTS ignore the importance of a foreclosure trustee's duties

Memorandum Decision - 24

to the consumer borrower.  The requirements for a notice of default under RCW 61.24.030 and 031 are straightforward and unambiguous.  The trustee is required to provide the name and address of the owner of the homeowner's loan.  RCW 61.24.030(8)(l).  All NWTS provided to the Meyers was the address and two phone numbers for ASC.  When Mr. Meyer called the phone numbers, a representative of Wells Fargo answered. Counsel for NWTS argued that everyone knows that ASC is a "dba" of Wells Fargo.  In fact, everyone does not know that – most, if not all, homeowners do not know that.  Most, if not all, homeowners would be completely perplexed by a reference to their home loan lender as "U.S. Bank National Association, as Trustee for Structured Asset Securities Corporation, Mortgage Pass-Through Certificates, 2006-GEL2." And while there is no law against maintaining a lender's name in that form, common sense dictates that if a foreclosure trustee is going to put that in a notice of default, some additional explanation will likely be necessary to the average homeowner.  Because NWTS provided no contact information for U.S. Bank as the trustee for GEL2, or for GEL2, the Meyers had no way to contact either to verify the information in the Notice of Default except through the servicer ASC.  The statute specifically requires the Notice of Default to include contact information for both the owner of the note and the servicer.

The Notice of Default purports to be a formal declaration that the Meyers were in default under their Note, in that it states "[t]he beneficiary *declares* you in default for failing to make payments as required by your note and deed of trust."  (Emphasis added).   Yet, there is no evidence that U.S. Bank ever declared the Meyers in default.  NWTS's misrepresentation of itself as the "authorized agent" of U.S. Bank made it appear that the Notice of Default did suffice as a declaration of default by the beneficiary.  In fact, RCW 61.24.030(8)(c), in effect at the time the Notice of Default was issued, required "[a] statement that the beneficiary *has declared* the

Memorandum Decision - 25

borrower or grantor to be in default…." (Emphasis added). The Meyers were insistent in their testimony that they had not received any formal notice of default from their lender prior to their receipt of the Notice of Default issued by NWTS.

In order to obtain contact information for their new lender, the Meyers were forced to hire an attorney to prepare a Qualified Written Request for them under the Truth in Lending Act. It wasn't until ASC responded to that request on January 12, 2011, six months after the foreclosure was commenced, that contact information for U.S. Bank was provided, with, of course, the admonition by ASC that "[a]lthough we are providing this information, the Trustee will more than likely refer you back to us [ASC] to answer any questions about the loan or the servicing of the loan." Ex. P-14.

Finally, as noted above, foreclosure against owner-occupied real property may not be commenced unless the due diligence requirements of RCW 61.24.031(5) have been completed by the beneficiary or an authorized agent, and unless the trustee has proof that the beneficiary is the owner of the promissory note. NWTS, because of its standard policy of accepting whatever is contained in a Loss Mitigation Form and Beneficiary Declaration without question, moved forward with foreclosure against the Meyers' Residence without exercising any diligence of its own to confirm the authority of U.S. Bank and Wells Fargo to initiate foreclosure.

While a foreclosure trustee is not required to be an attorney, they must be capable of assembling enough information about the lender, servicer and others involved in the lending chain to be able to objectively satisfy the homeowner that the correct party is initiating the action to take their home. The foreclosure trustee should be able to accurately state minimal information required by the DOTA to be included in the notice of default, which is, from the perspective of the homeowner, the frightening first step to the loss of their home. A homeowner

Memorandum Decision - 26

should not be required to hire an attorney to draft a Qualified Written Request under the Truth in Lending Act just to get the name and address of their home loan lender. In short, NWTS must be more than a typing service for the lending community. The Court therefore concludes that the failures of NWTS under the DOTA in this case are both unfair and deceptive acts within the meaning of the WACPA.

### 2. Occurring in Trade or Commerce.

There can be no serious question that the actions of NWTS relative to the Meyers' foreclosure action and the other foreclosures handled by NWTS in the State of Washington occurred in trade or commerce.

### 3. Public Interest Impact.

Whether NWTS complies with its duties under the DOTA has a significant impact on the public interest. Homeowners have a right to a trustee who acts in good faith toward them in the exercise of its foreclosure duties. Homeowners have a right to accurate information and conduct by the trustee which complies with state law. The testimony demonstrated that NWTS, as a matter of practice, accepts all information provided to it through its Vendorscape portal without verification or question, without any knowledge concerning the source or accuracy of that information, and without exercising any discretion relative to the interests of the borrower. Mr. Meyer summed up the sentiment of the thousands of Washington homeowners who have lost their homes to foreclosure in the recent economic downturn: the threat of foreclosure of his family's home was the worst event of his life. The Court concludes that the Meyers have proved the public interest element of their WACPA claim.

### 4. Causation and Injury.

Before a violation of the WACPA may be found, an injury to the claimant's business or

property must be established. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d at 792, 719 P.2d 531. The injury "need not be great" and no monetary damages need be proven. *Mason v. Mortgage America, Inc.*, 114 Wash.2d 842, 854, 792 P.2d 142 (1990); *Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc.*, 64 Wash.App. 553, 563, 825 P.2d 714 (1992). Nonquantifiable injuries, such as loss of goodwill, suffice to prove injury, *Nordstrom, Inc. v. Tampourlos*, 107 Wash.2d 735, 733 P.2d 208 (1987), but mental distress alone does not establish injury. *Stephens v. Omni Ins. Co.*, 138 Wash.App. 151, 180, 159 P.3d 10 (Wash.Ct.App. 2007). Incurring time and money to prosecute a WACPA claim does not suffice as an injury to business or property. *Sign-O-Lite*, 64 Wash.App. at 564, 825 P.2d 714. On the other hand, "[c]onsulting an attorney to dispel uncertainty regarding the nature of an alleged debt is distinct from consulting an attorney to institute a CPA claim." *Panag v. Farmers Ins. Co. of Washington*, 166 Wash.2d 27, 62, 204 P.3d 885 (2009). As for damages, as opposed to injury, the court in *Mason* stated:

> [W]hether an "injury" has been sustained so as to support an award of attorneys' fees and costs under the Consumer Protection Act is a different inquiry than whether treble damages are appropriately awarded. An injury cognizable under the Act will sustain an award of attorneys' fees while treble damages are based upon "actual" damages awarded.

*Mason*, 114 Wash.2d at 855, 792 P.2d 142. Finally, on causation, the Washington Supreme Court instructs that "[i]f investigative expense would have been incurred regardless of whether a violation existed, causation cannot be established." *Panag*, 166 Wash.2d at 64, 204 P.3d 885.

In this case, NWTS had a simple task: provide the Meyers with an address and telephone number for the owner of the Note and exercise independent judgment to confirm the authority of the entities requesting foreclosure of the Residence. But for the failure of NWTS to provide that information in the Notice of Default as required by the DOTA and to exercise independent

Memorandum Decision - 28

judgment, the Meyers would not have been forced to incur the expense of retaining Mr. Jones to

pursue additional information concerning their loan and Mr. Feinstein to file a bankruptcy

proceeding in order to stop a foreclosure which was improperly instituted as to their Residence.

**5.    Damages.**

Under the WACPA, the Meyers are entitled to actual damages, together with the costs of

suit, including a reasonable attorney's fee.  RCW 19.86.090.  The Court may increase the award

to three times the amount of actual damages, provided the award does not exceed $25,000.

Because the Notice of Default issued by NWTS was completely defective, the Meyers are

entitled to all of the damages they suffered which flowed from the unlawful foreclosure activities

of NWTS.  In short, they should not have been displaced from their home based upon the Notice

of Default.  As detailed in the facts above, those damages total $23,504.  The Court further finds

that trebling under RCW 19.86.090 is also warranted up to the statutory maximum of $25,000.

The Meyers are also entitled to seek recovery of the costs of this suit, including a reasonable

attorney's fee.

**C.    Fair Debt Collection Practices Act**.

The Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p ("FDCPA") was

enacted "'to protect consumers from a host of unfair, harassing, and deceptive collection

practices without imposing unnecessary restrictions on ethical debt collectors.'" *FTC v. Check*

*Investors, Inc.*, 502 F.3d 159, 165 (3rd Cir. 2007) *cert. denied Check Investors, Inc. V. F.T.C.*,

555 U.S. 1011, 129 S.Ct. 569, 172 L. Ed. 429 (2008)(*quoting Staub v. Harris*, 626 F.2d 275,

276–77 (3rd Cir. 1980) (internal quotations omitted)).  Under the act, a debt collector may not

use unfair or unconscionable means to collect or attempt to collect any debt (15 U.S.C. §1692f),

nor may a debt collector use any "false, deceptive, or misleading representation or means in

connection with the collection of any debt" (15 U.S.C. §1692e).  In *Walker*, *supra,* the Washington appellate court addressed the potential liability of foreclosure trustees under these two sections and discussed developing federal law on the issues, concluding that as long as a trustee confines itself to actions necessary to effectuate a foreclosure, its liability will be solely under Section 1692f rather than Section 1692e.  308 P.3d at 725-26.[9]

In analyzing liability under Section 1692, *Walker* relied on *McDonald v. OneWest Bank*, 2012 WL 555147 (W.D. Wash. Feb. 21, 2012).  In *McDonald*, the court noted the current trend among federal district courts in the Ninth Circuit to limit a trustee's liability to Section 1692f if they confine their activities to foreclosure, citing *Jara v. Aurora Loan Services, LLC*, 2011 WL 6217308, at * 5 (N.D.Cal. Dec.14, 2011); *Pizan v. HSBC Bank USA, N.A.*, 2011 WL 2531104, at *3 (W.D.Wash. June 23, 2011) ; *Lettenmaier v. Fed. Home Loan Mortg. Corp.*, 2011 WL 1938166, at *11–12 (D.Or. May 20, 2011); *Armacost v. HSBC Bank USA*, 2011 WL 825151, at * 5–6 (D. Idaho Feb. 9, 2011); *Long v. Nat'l Default Servicing Corp.,* 2010 WL 3199933 at *4 (D. Nev. Aug. 11, 2010).  In the absence of any Ninth Circuit law, the Court sees no reason to depart from this trend.

In this case, there is no evidence that NWTS took any action other than that which was necessary to effectuate a nonjudicial foreclosure against the Residence.  Accordingly, NWTS could be liable only under Section 1692f if it commenced the foreclosure against the Residence when (A) there was no present right to possession of the property claimed as collateral through an enforceable security interest; (B) there was no present intention to take possession of the property; or (C) the property was exempt by law from such dispossession or disablement.  15 U.S.C. § 1692f(6).  In *Walker*, the court noted that the trustee there could be liable under Section

---

[9]  For purposes of Section 1692f(6), a "debt collector" includes a "person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests."  15 U.S.C. § 1692a(6).

1692f(6)(A) if it commenced foreclosure without a valid appointment as trustee.  308 P.3d 716, 726.  In this case, however, NWTS had been appointed successor trustee when it issued the Notice of Default, and it proved at trial that U.S. Bank was the holder of the Note with a right to foreclose against the Residence.  Accordingly, the Court finds there was a present right of possession of the property through an enforceable security interest, although the procedure initiating the enforcement of that security interest was defective.  Accordingly, the Court finds that the Meyers have failed to prove entitlement to relief under the FDCPA.

**CONCLUSION**

For the foregoing reasons, the Court finds in favor of the Meyers in the amount of $48,504, consisting of actual damages of $23,504, plus treble damages under the WACPA of $25,000.  The Meyers may request costs of suit and a reasonable attorney's fee under the WACPA by separate motion and submit an order and judgment in conformance with this Memorandum Decision.

///END OF MEMORANDUM DECISION///

Memorandum Decision – 31